1  Jonathan A. Backman                                          E-filed on: February 8, 2010
   Law Office of Jonathan A. Backman
2  117 N. Center Street
   Bloomington, Illinois 61701-5001
3  (309) 820-7420
   jbackman@backlawoffice.com
4  Counsel for the Liquidating Trustee
   Counsel Will Comply with
5  LR IA 10-2 within 10 Days

6                    IN THE UNITED STATES BANKRUPTCY COURT
                               DISTRICT OF NEVADA
7

8   IN RE:                                )        Chapter 11
                                          )
9   XYIENCE INCORPORATED,                 )
10  a Nevada corporation,                 )        No. BK-S-08-10474-MKN
                                          )
11  Debtor.                               )
    _____  )
12  DAVID HERZOG,                         )
    as Liquidating Trustee,               )
13                                        )
    Plaintiff,                            )        Adversary Case No. _____
14                                        )
    v.                                    )
15                                        )
    ZUFFA MARKETING, LLC, a Nevada        )
16  limited liability company,            )
                                          )
17  Defendants.                           )

18                                 **COMPLAINT**

19          Plaintiff David Herzog, as Liquidating Trustee (the "Trustee") for the estate

20  of Xyience Incorporated (the "Debtor"), the former debtor and debtor in possession the

21  above-captioned Chapter 11 case (the "Case"), complains against defendant Zuffa

22  Marketing, LLC, a Nevada limited liability company ("Zuffa Marketing"), as follows:

23                               **BANKRUPTCY CASE**

24          1.      On January 18, 2008 (the "Petition Date"), the Debtor filed in this

25  Court (the "Court") its voluntary petition for relief under Chapter 11 of the Bankruptcy

26  Code, 11 U.S.C. § 101 et. seq. (the "Bankruptcy Code" or the "Code").

27

28

2.      Pursuant to an Order entered January 31, 2008 (the "Avoidance Date Order"), the Court dismissed, with prejudice, an involuntary petition for relief under chapter 11 of the Bankruptcy Code filed against the Debtor on January 3, 2008, as Case No. BK-S-08-10049-MKN.

3.      The Avoidance Date Order further provides that, in this Case, the period for avoidance actions under the applicable provisions of the Bankruptcy Code will be measured as if the petition date in this Case were January 3, 2008 (the "Extended Avoidance Date").

4.      From January 18, 2008 through the October 23, 2008, entry of the Plan Confirmation Order (as hereinafter defined), the Debtor operated and managed its business affairs as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.      On May 19, 2008, the Debtor filed its Plan of Reorganization ("Plan"), which provided, among other things, that substantially all of the Debtor's remaining assets, including all of its pre-petition claims, rights and causes of action, and all of its right and powers to pursue avoidance actions under Chapter 5 of the Bankruptcy Code, would be transferred to and would vest in a Liquidating Trust for the benefit of various creditor classes.

6.      The Plan further provided that, upon the Effective Date of the Plan, a Liquidating Trustee would represent the Trust Estate.

7.      On October 23, 2008, the Court entered an Order (the "Plan Confirmation Order") approving the Debtor's Disclosure Statement in connection with the Plan and confirming the Plan of Reorganization.

8.      On November 12, 2009, the Court entered an Order authorizing the Trustee to accept the appointment as Liquidating Trustee, and the Trustee accepted his appointment on that day.

9.      On November 20, 2009, the Trustee caused notice of appointment to be filed and served, and on November 23, 2009, the Plan became effective.

2

## JURISDICTION

10.     The Court possesses subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b).

11.     This Adversary Proceeding is a core proceeding under 28 U.S.C. § 157.

12.     Venue of this Adversary Proceeding lies in this judicial district under 28 U.S.C. 1409(a) because the Bankruptcy Case is pending here.

## PARTIES

13.     Plaintiff is the Liquidating Trustee.

14.     Zuffa Marketing is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

## BACKGROUND FACTS

15.     The Debtor is a Nevada corporation with its principal place of business in Las Vegas, Nevada.

16.     Since its founding in May 2004, the Debtor has been engaged in the production, sale, marketing, and distribution of, among other things, energy drinks, fitness supplements, nutritional products, and apparel that are distributed around the United States and Canada.

17.     The Debtor's principal line of business involves the sale and marketing of its energy drink (XenergyTM) which the Debtor advertises largely through its sponsorship of the Ultimate Fighting Championship (the "UFC").

18.     In or about January 2006, the Debtor entered into a sponsorship agreement with Zuffa Marketing, which operates and does business as the Ultimate Fighting Championship mixed martial arts production and network.

19.     Through this marketing agreement, the Debtor became an important sponsor of, and source of revenue for, Zuffa Marketing.

3

20.    Zuffa Marketing was and is wholly owned by Zuffa, LLC.

21.    Zuffa, LLC, is an affiliate of Fertitta Enterprises, Inc ("Fertitta Enterprises" or "Fertitta").

22.    In or around June 2007, with the Debtor facing financial problems and having difficulty meeting its payment obligations to Zuffa Marketing, the owners of Zuffa and Fertitta decided, for various reasons, including the need to ensure that the Debtor would continue making license payments to Zuffa Marketing, to take over ownership and control of the company.

23.    As part of this plan, Zuffa Marketing accepted large amounts of stock in addition to and in lieu of payments from the Debtor.

24.    When it became evident that the Debtor's financial structure — that is, its secured and other unsecured creditors, and the substantial number of outstanding stockholders — would render an ordinary takeover through stock acquisition too expensive, Zuffa Marketing and its owners decided instead to capture the company through a series of secured loans, forced defaults and then a foreclosure of the Debtor's assets.

25.    Fertitta Enterprises and its senior officer, Mr. Bullard, took the lead in effecting the plan.

26.    In or about June and July 2007, through promises of personal financial gain and of an ownership interest in a new entity that would own the Debtor's assets and business, Mr. Bullard and his colleagues at Fertitta persuaded various of the Debtor's officers and directors to work with Fertitta and Mr. Bullard to enable Fertitta to take over the company through its lend-to-own strategy.

27.    On or about July 26, 2007, Fertitta Enterprises and two of the Debtor's officers and directors lent the Debtor a total of $1.5 million — i.e., $1 million, $250,000.00 and $250,000.00, respectively — as the first stage of their lending scheme.

28.    In or about September and early October 2007, the Debtor's president, Mr. Adam Frank notified several of the Debtor's secured creditors and

4

approximately 10 or so of its more than 380 stockholders that he was going to shut down the company, and thereby destroy its value entirely, unless the secured lenders subordinated to, and shareholders holding 70% of the outstanding shares of the corporation consented to, a new $12.0 million senior secured loan from Fertitta Enterprises.

29.    At the same time, Mr. Frank advised these persons and entities that the loan was going to be used principally for working capital.

30.    Faced with these threats, the secured lenders agreed to subordinate their loans, and shareholders holding approximately 60% of the outstanding shares of the corporation, many of whom also were unsecured creditors of the Debtor as well, agreed to the financing.

31.    At the time, the secured lenders and other creditors did not know, and had not been told by Fertitta or by Messrs. Bullard and Frank (a) that Fertitta as well as Mr. Frank and Mr. Kirk Sanford (another Xyience board member), would be receiving substantial portions of the $12 million loan proceeds in payment of their antecedent debts, (b) that Zuffa Marketing would receive more than $4.5 million on account of an antecedent debt that the Debtor did not need to pay, (c) that the true purpose of the loan was to permit Fertitta (or its affiliates) to obtain control and ownership of the Debtor's business and assets, or (d) that upon agreeing to Mr. Frank's demands, these parties' claims would effectively be worthless because the Debtor intended to default on its very first payment obligation under the new loan facility.

32.    At or about this time, Fertitta's owners caused Zyen, LLC "(Zyen") to be created for the purpose of funding the loan, and provided Zyen with the funds with which to make the loan.

33.    On or about October 4, 2007, Zyen consummated the loan, lending the Debtor approximately $9.5 million that day, and another $2.5 million within the next several weeks.

5

34.     As part of the financing, Mr. Bullard became a member of the Debtor's board of directors.

35.     From and after October 4, 2007, Mr. Bullard, in his capacity as an officer of, and in acting for the benefit of, Fertitta Enterprises, Zyen and Zuffa Marketing, had control over and final decision-making authority over every significant expenditure that the Debtor made and virtually all of its assets, business and financial decisions.

36.     At the time Zyen made the loan, Zyen, Fertitta and Messrs. Frank Bullard intended and planned that the Debtor promptly would default on the loan and that Zyen would foreclose on and take over control of all of the Debtor's assets.

37.     Also on or about the same day as the Zyen loan, Mr. Frank and Mr. Sanford caused the Debtor to enter into a new sponsorship agreement with Zuffa Marketing that was far more favorable to the latter than the January 2007 agreement.

38.     On October 5, 2007, the Debtor used the Zyen loan proceeds, among other things, to pay $4.5 million to Zuffa Marketing (the "Zuffa Payment") on account of missed payments under the January 2007 sponsorship agreement.

39.     On or about November 4, 2007, the Debtor, by Mr. Frank, and at the direction of Mr. Bufford, and despite having in excess of $1.0 million in cash on hand to make its first payment (of between $100,000 and $150,000) on the Zyen note, intentionally failed to make the payment, thereby placing the Debtor in default of the Zyen loan agreements.

40.     In or around late November 2007, the Debtor, by Messrs. Sanford and Frank, and with the support of Mr, Bullard, and despite having had more than sufficient cash during the prior month to make the payment then due under the new Zuffa Marketing sponsorship agreement, caused the Debtor to default under that agreement so as to provide Zuffa Marketing and Zyen with maximum flexibility in negotiating a new sponsorship or licensing agreement beneficial to them once Zyen foreclosed on the Debtor's assets.

41.     Despite knowing that the Debtor would be defaulting on its sponsorship agreement, and thus would be prohibited from selling merchandise containing the UFC label and trademark, Messrs. Bullard, Frank and Sanford, throughout November and December 2007, caused the Debtor to order and have millions of dollars worth of product manufactured with the UFC label so that the Debtor would be forced to deal with Zuffa Marketing, on Zuffa Marketing's terms, when following the Zyen strict foreclosure, the Debtor was forced into a bankruptcy proceeding.

42.     In December 2007, as the parties had planned, Zuffa Marketing terminated the October sponsorship agreement.

43.     In or about the first week of December 2007, Zyen, with the Debtor's consent, commenced a strict foreclosure under Article 9 of the Uniform Commercial Code to take ownership of all of the Debtor's assets.

44.     In the meantime, beginning in October 2007, Messrs. Frank, Sanford and Bullard had begun meeting with supposedly independent persons from Canada (i.e., from Manchester Consolidated Corp.) to serve as a front for the transfer of assets following Zyen's foreclosure of the assets or, if necessary, a forced asset sale during a bankruptcy case.

45.     During these meetings, Mr. Bullard reached an agreement with Manchester pursuant to which Manchester would purchase the Debtor's assets, would create a new entity to do business as Xyience ("New Xyience") and would grant Zyen a controlling interest in the new entity.

46.     In mid-October 2007, Messrs. Frank, Sanford and Bullard induced Mr. Sattar to join the Debtor's management because they knew that Mr. Sattar, on account of his other relationships with Mr. Sanford, would be beholden to them and would do whatever they asked.

47.     In mid-November 2007, Mr. Sattar became the President and Chief Operating Officer of the Debtor, and immediately following the Petition Date, Mr. Sattar became a director of the Debtor, the Debtor's president and a designated representative.

7

48.    Also immediately following the Debtor's bankruptcy filing in January 2008, Mr. Sattar, in concert with Mr. Bullard, negotiated agreements with Zyen and Zuffa Marketing — i.e., a debtor in possession lending facility and a new license agreement, respectively — solely for the purpose of granting the two affiliated entities full control over the Debtor's business and assets, thereby ensuring that the two could direct that the Debtor's assets be sold to Manchester and ultimately to New Xyience.

49.    During these negotiations, Mr. Sattar pursued only the best interests of Zyen and Zuffa Marketing, not the Debtor and its creditors and shareholders, and the deal he struck with these entities was substantially less favorable than Mr. Sattar could have achieved for the Debtor had he not been serving the interests of Zyen, Zuffa and their insiders.

50.    In particular, the Non-Exclusive Limited License Agreement (the "License Agreement") between the Debtor and Zuffa Marketing, in addition to providing for a license fee of $9,000 per day, also required the Debtor to release (among other things) all claims against Zuffa Marketing, including a claim to recover the Zuffa Payment as a preferential transfer under section 547 of the Bankruptcy Code.  A true and correct copy of the License Agreement, with certain portions redacted to accommodate concerns previously expressed by Zuffa Marketing to the Debtor, is attached hereto as Exhibit A.

51.    At the time that Zuffa Marketing and the Debtor entered into the License Agreement, they knew that the so-called earmarking defense would not apply to the Zuffa Payment because the October 2007 Zyen loan documents had not required that the Debtor use the loan proceeds to pay Zuffa Marketing's past due amounts under the January sponsorship agreement and because the Ninth Circuit Court of Appeals, in the Metcalf v. Golden case, had expressly held just months earlier that such a requirement was a condition of the earmarking defense.

52.    Nevertheless, in the License Agreement, Zuffa Marketing referred to the Zuffa Payment as "earmarked loan proceeds" for the purpose and with the intent of misleading other parties and the Court into believing that the release of the preference

8

claim did not represent the transfer of significant value from the Debtor to Zuffa

Marketing because the earmarking doctrine would protect the Zuffa Payment.

53.    On February 12, 2008, at the hearing on approval of the License

Agreement, Zuffa Marketing falsely informed the Court that the Zuffa Payment came

from earmarked funds, and that the earmarking defense would provide a bona fide

defense to a preference claim.

54.    At the same hearing, and in the declarations submitted to the Court

in connection with it, the Debtor and Zuffa, acting together, also falsely informed and

misled the Court (a) that Zuffa was prepared to terminate the Debtor's license, and

prevent the Debtor from selling its inventory, if Zuffa did not receive the release contained

within the License Agreement, (b) that the Debtor's predicament as to the allegedly $8.0

million of inventory that would become worthless was the result of the Debtor's

unexpected shortage of funds rather than an occurrence that the Debtor and Zuffa had

planned back when the inventory was ordered, and (c) that the purpose of the License

Agreement was to enable the Debtor to maximize its value in seeking an independent

purchaser, when in fact the Debtor, Zyen and Zuffa already knew who the purchaser

would be, as well as the approximate purchase price, and were using the prospect of an

independent purchaser exclusively to induce the Court to authorize the License

Agreement's extraordinary release.

55.    By Order entered on March 3, 2008 (the "Approval Order"), the Court

relied on the foregoing misrepresentations in approving the License Agreement and the

portions of the releases contained therein that, by their terms, would have released a

preference claim with respect to the Zuffa Payment.

56.    The Approval Order limited the release to the extent that it sought

to release affiliates and other insiders of Zuffa Marketing from liability for avoidable

transfers and affirmative misconduct having no connection with the sponsorship and

licensing relationship between the Debtor and Zuffa Marketing.

9

57.    Still, the portions of the release that the Approval Order approved, if effective, combined with license fee payable under the License Agreement, would amount to in excess of $5.1 million of consideration for a 75-day non-exclusive license period, or roughly $68,000 per day for the license.

58.    The true value of the license was no more than $9,000 per day, and in reality, substantially less.

## COUNT I: RESCISSION OF LICENSE AGREEMENT

59.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

60.    The License Agreement is unenforceable, and the release therein should be rescinded and voided, because the License Agreement was procedurally and substantively unconscionable as described above.

## COUNT II: REVOCATION OF APPROVAL ORDER

61.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

62.    The Approval Order was procured through misconduct and fraud on the Court, and therefore should be vacated in accordance with Rule 60(d)(3) of the Federal Rules of Civil Procedural, as made applicable here by Rule 9024 of the Federal Rules of Bankruptcy Procedure.

## COUNT III: PREFERENCE
### (11 U.S.C. § 547)

63.    The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

64.    Prior the Extended Avoidance Date, the Debtor was indebted to Zuffa Marketing.

65.    Within the 90 days prior to the Extended Avoidance Date, on or about October 5, 2009, Zuffa Marketing received the Zuffa Payment.

10

66.     The Zuffa Payment was made to Zuffa Marketing for or on account of an antecedent debt owed by the Debtor to Zuffa Marketing before the payment was made.

67.     The Zuffa Payment was made while the Debtor was insolvent, and enabled Zuffa Marketing to receive more than it would have received in this Case if the Case were a case under Chapter 7 of the Bankruptcy Code, the Payment had not been made and, instead of the Payment, Zuffa Marketing had received payment on its claim under the applicable provisions of the Bankruptcy Code.

68.     On January 1, 2010, Zuffa Marketing agreed to toll the limitations period for commencing an avoidance action against it, if applicable, for two weeks, through the close of business on Friday, January 15, 2010.

69.     On Tuesday, January 19, 2010, following Monday's court holiday, Zuffa agreed to a 48-hour tolling period, so the limitations period for the claims at issue here was set to expire on Thursday January 21, 2010.

70.     Before this period expired, the parties, through their counsel, further tolled the running of the limitations period, through a series of extensions, through the close of business on Monday, February 8, 2010.

71.     Accordingly, the Trustee is entitled to avoid the Zuffa Payment pursuant to section 547(a) of the Bankruptcy Code, and is entitled to recover the amount of such Payments from Zuffa Marketing pursuant to section 550(a)(1) of the Bankruptcy Code.

## COUNT IV: BREACH OF CONTRACT

72.     The Trustee realleges and incorporates by reference each of the foregoing allegations of this Complaint as if fully restated here.

73.     On January 16, 2010, Zuffa Marketing agreed to settle all claims at issue arising from the facts alleged above by reducing its super-priority claim in this bankruptcy case to $275,000 and reducing its general unsecured claim to $3,000,000.

11

74. On January 17, 2010, after an inquiry from the Trustee's counsel, Zuffa Marketing restated this offer.

75. On January 17, 2010, and then again on January 18, 2010, the Trustee accepted the offer.

76. On or about January 19, 2010, Zuffa Marketing advised the Trustee that it would not honor its agreement to reduce its super-priority administrative claim and its general unsecured claim unless the Debtor granted it other concessions and consideration not within the scope of the parties' agreement.

77. On account of the foregoing, the Court should either enforce the parties' settlement agreement or enter judgment for the Trustee and against Zuffa in the amount of no less than $200,000, plus the costs of this suit.

## CONCLUSION

WHEREFORE, the Trustee prays that this Court (i) void, rescind or amend the Post-Petition Agreement as unconscionable, (ii) revoke, vacate or amend the Approval Order to disallow the release to the extent that it releases the Zuffa Payment, (iii) enter judgment for the Trustee and against Zuffa Marketing in the amount of the Zuffa Payment, plus interest and costs, (iv) enforce the parties' settlement agreement, and (v) grant the Trustee such other and further relief as the Court deems just and proper.

Dated: February 8, 2010

Respectfully submitted,


/s/  Jonathan A. Backman

12

1

Jonathan A. Backman
Law Office of Jonathan A. Backman
117 N. Center Street
Bloomington, Illinois 61701-5001
(309) 820-7420
FAX:  (309) 820-7430
jbackman@backlawoffice.com

2

3

4

5

*David Herzog, as Liquidating Trustee for the
    Estate of Xyience, Incorporated*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28